[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] Inconsistent spellings of appellant's last name appear in the record. At times, his last name is spelled "Frye," instead of "Fry." This opinion uses the spelling as it appears on the initial complaint, "Fry."
 DECISION AND JUDGMENT ENTRY
{¶ 1} Douglas H. Fry appeals the trial court's decision to overrule his motion to suppress evidence and his convictions for possession of drug paraphernalia and marijuana. First, he contends that because he did not voluntarily consent to a search of his vehicle, the marijuana and drug paraphernalia discovered in his car were the product of an illegal search. Second, Fry argues that his convictions are against the manifest weight of the evidence as the state did not prove that he actually or constructively possessed either the marijuana or drug paraphernalia.
 {¶ 2} Because there is some evidence to support the trial court's conclusion that Fry voluntarily consented to the search of his vehicle, Fry waived the protection of the Fourth Amendment against unreasonable searches. Thus, the trial court properly overruled Fry's motion to suppress. Additionally, the record contains substantial evidence that Fry constructively possessed the marijuana and drug paraphernalia. The law enforcement officer discovered these items in a storage pocket located adjacent to the driver's seat, where Fry had been sitting, and beneath Fry's cell phone. Consequently, his convictions are not against the manifest weight of the evidence. Thus, we affirm the trial court's judgment.
 {¶ 3} After Fry was charged with possession of drug paraphernalia, possession of marijuana, and failure to wear a seat belt, he filed a motion to suppress evidence, arguing that the evidence was uncovered during an illegal search.
 {¶ 4} At the motion hearing, Ohio State Highway Patrol Trooper Paul T. Mercer testified that at approximately 2:01 a.m. one morning he stopped Fry for failing to have a properly illuminated headlight. When he approached the vehicle, he noticed that Fry was not wearing a seat belt. He thus issued a warning for the headlight and a citation for failing to wear a seat belt. The trooper then told Fry that he had completed the traffic stop and asked Fry if he could search the vehicle. In his written report, the trooper stated that he advised Fry that he was free to leave. At the suppression hearing, Trooper Mercer explained: "As I approached the vehicle after writing the citation * * * I explained the citation to [Fry] * * * what his options were to take care of the citation. At that point, I gave him his copy of the citation, and stated to him that the traffic stop at this point was complete. * * * [T]hat we were finished, and then I asked him, * * * but I would like to know if he would give me consent to search the vehicle. At which time he asked me, `why do you want to search the vehicle?' And I again told him it was just based on his consent. Whether he consented to let me search or not. And he * * * opted to let me search the vehicle."
 {¶ 5} In further explaining how he responded to Fry, Trooper Mercer "told [Fry] that [his] search * * * was strictly based on [Fry's] consent. His consent alone. If he was to tell me yes, that I would do the search. If he was to tell me no, that I could not do the search." Trooper Mercer testified that he did not threaten Fry and did not make him believe that he had to consent to the search.
 {¶ 6} Fry claimed that he did not consent to the search of his vehicle. He testified that the trooper never told him that he was free to go, and "[i]n fact, not only was I not told that I was free to go, there were two men with guns, and two vehicles. * * * I mean why would I leave without someone saying you are free to go. Have a nice evening. You may go home now." Fry testified that the trooper did not give him any instructions on his right to refuse consent.
 {¶ 7} In explaining how he refused consent, Fry stated: "I simply said `Do you have a reason?' And he said `no, it's a consensual search * * *. I said `Well do you have a reason sir,' and he said, `no I don't have a reason,' and * * * I started to say `I have nothing to hide sir,' and `I don't feel you should search my vehicle without a reason.' And at that point, he said get out of the car now! And opened the door for me."
 {¶ 8} Fry stated that he "felt by saying do you have a reason to search my vehicle that I was * * * *" (omission in original). The court then interjected: "So by * * * answering a question with a question, you thought that was a refusal."
 {¶ 9} Fry additionally explained that he has "been trained to not resist authority" and that he felt intimidated "facing an officer with a badge and a gun. It's two in the morning, and I'm tired. And the gentlemen [sic] is speaking quickly, and he is simply saying, `no I don't have a reason, that's why it's a consensual search.'"
 {¶ 10} The trial court subsequently overruled Fry's motion to suppress, concluding that Fry voluntarily consented to the search. The court found that the trooper advised Fry that the traffic stop was completed and that he was free to leave before requesting Fry's consent to search. The court determined that Trooper Mercer's indication to Fry that "the search would only happen if [Fry] gave permission" would "[c]learly [lead] a person of [Fry]'s educational background as would any reasonable person [to] believe that he had the freedom to refuse the search and the freedom to leave." The court noted that no evidence existed that the trooper physically restrained Fry, grabbed him, or threw him anywhere, "only that the Trooper was courteous and professional at all times."
 {¶ 11} After overruling Fry's motion to suppress, the court held a bench trial. There, Trooper Mercer stated that during the search of Fry's vehicle, he located a marijuana seed on the passenger's seat and he smelled the odor of burnt marijuana. Ultimately, he found a clear plastic baggie containing green vegetation protruding beneath a cell phone that was located inside a storage compartment on the driver's door. Once he removed the baggie, he also discovered E-Z Rider rolling papers.
 {¶ 12} Fry stated that the day of the stop, he attended his cousin's graduation near Cincinnati and then attended a concert at Polaris Amphitheater in Columbus. He stated that throughout the day, about five people were in and out of his car. He does not know how the marijuana got in his car.
 {¶ 13} The court subsequently found Fry guilty of all charges.
 {¶ 14} Appellant timely appealed the trial court's judgment and raises the following assignments of error: "First Assignmentof Error: The trial court erred in failing to suppress the evidence seized from appellant's vehicle. Second Assignment ofError: The trial court found consent was given against the manifest weight of the evidence concerning the vehicular search.Third Assignment of Error: The trial court erred in finding the defendant guilty against the manifest weight of the evidence."
 I {¶ 15} In his first and second assignments of error, Fry argues that the trial court erred by overruling his motion to suppress the evidence that Trooper Mercer seized from his vehicle. He claims that the trooper discovered the evidence during an illegal detention and that he never consented to the search of his vehicle. Because Fry's first and second assignments of error challenge the court's decision regarding his motion to suppress, we consider them together.
 {¶ 16} Appellate review of a trial court's decision regarding a motion to suppress involves mixed questions of law and fact. See State v. Featherstone, 150 Ohio App.3d 24, 778 N.E.2d 1124,2002-Ohio-6028, at ¶ 10 (citing State v. Vest (May 29, 2001), Ross App. No. 00CA2576); State v. Long (1998),127 Ohio App.3d 328,332,713 N.E.2d 1. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See State v. Dunlap (1995), 73 Ohio St.3d 308,314, 652 N.E.2d 988; State v. Fanning (1982), 1 Ohio St.3d 19,20, 437 N.E.2d 583. Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See Dunlap, supra;Long, supra; State v. Medcalf (1996), 111 Ohio App.3d 142,675 N.E.2d 1268. The reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. See Featherstone; State v. Fields (Nov. 29, 1999), Hocking App. No. 99 CA 11. See, generally, United Statesv. Arvizu (2002), 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740;Ornelas v. United States (1996), 517 U.S. 690, 116 S.Ct. 1657,134 L.Ed.2d 911.
 {¶ 17} The Fourth Amendment to the United States Constitution protects individuals against unreasonable governmental searches and seizures. See, e.g., Arvizu, 534 U.S. at 273; Terry v.Ohio (1968), 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889. "Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." Katz v.United States (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. Once the defendant demonstrates that he was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible. See Maumee v. Weisner (1999),87 Ohio St.3d 295, 297, 720 N.E.2d 507; Xenia v. Wallace (1988),37 Ohio St.3d 216, 524 N.E.2d 889, paragraph two of the syllabus.
 {¶ 18} No Fourth Amendment violation occurs when an individual voluntarily consents to a search. See United Statesv. Drayton (2002), 536 U.S. 194, 207, 122 S.Ct. 2105,153 L.Ed.2d 242 (stating that "[p]olice officers act in full accord with the law when they ask citizens for consent"); Schnecklothv. Bustamonte (1973), 412 U.S. 218, 219, 93 S.Ct. 2041,36 L.Ed.2d 854 ("[A] search conducted pursuant to a valid consent is constitutionally permissible"); State v. Comen (1990),50 Ohio St.3d 206, 211, 553 N.E.2d 640. Consent to a search is "a decision by a citizen not to assert Fourth Amendment rights." Katz, Ohio Arrest, Search and Seizure (2004 Ed.), Section 17:1, at 341. In Schneckloth, the United States Supreme Court acknowledged the importance of consent searches in police investigations, noting that "a valid consent may be the only means of obtaining important and reliable evidence" to apprehend a criminal. Id. at 227-228.
 {¶ 19} Fry contends that once the purpose of the initial stop was completed, the trooper's continued questioning amounted to an illegal detention. Accordingly, we will assume without deciding that briefly detaining Fry to ask for his consent was illegal. But, see, State v. Robinette (1997), 80 Ohio St.3d 234, 241,685 N.E.2d 762 (Robinette or Robinette III), citing Davis v.United States (1946), 328 U.S. 582, 593-594, 66 S.Ct. 1256,90 L.Ed. 1453. The state does not expressly dispute Fry's contention that he was illegally detained at the time Trooper Mercer requested Fry's consent to search. However, the fact the detention was illegal does not per se render the consent invalid. An individual's voluntary consent, determined under the totality of the circumstances, may validate an illegal detention and subsequent search if the consent is an "independent act of free will." Florida v. Royer (1983), 460 U.S. 491, 501-502,103 S.Ct. 1319, 75 L.Ed.2d 229. For an unlawfully detained individual's consent to be considered an independent act of free will, "the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." Robinette, 80 Ohio St.3d at 241, paragraph three of the syllabus. This is an objective test, and the proper inquiry "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."Florida v. Bostick (1991), 501 U.S. 429, 436, 111 S.Ct. 2382,115 L.Ed.2d 389.
 {¶ 20} The state has the burden of proving, by "clear and positive" evidence, not only that the necessary consent was obtained, but that it was freely and voluntarily given. Floridav. Royer (1983), 460 U.S. 491, 497, 103 S.Ct. 1319,75 L.Ed.2d 229; Bumper v. North Carolina (1968), 391 U.S. 543, 548,88 S.Ct. 1788, 20 L.Ed.2d 797; State v. Posey (1988),40 Ohio St.3d 420, 427, 534 N.E.2d 61. "Clear and positive evidence" is the equivalent of clear and convincing evidence. State v. Danby
(1983), 11 Ohio App.3d 38, 41, 463 N.E.2d 47.
 {¶ 21} Whether an individual voluntarily consented to a search is a question of fact, not a question of law. See Ohio v.Robinette (1996), 519 U.S. 33, 40, 117 S.Ct. 417,136 L.Ed.2d 347; Schneckloth, 412 U.S. at 227; Robinette,80 Ohio St.3d at 248-249; see, also, State v. Southern (Dec. 28, 2000), Ross App. No. 00CA2541.[2] Because reviewing courts should defer to the trial court when it acts as a trier of fact, we must give proper deference to the court's finding regarding whether Fry voluntarily consented to a search.
 {¶ 22} Thus, we review the court's finding that appellant voluntarily consented to the search under the weight of the evidence standard set forth in State v. Schiebel (1990),55 Ohio St.3d 71, 74. Even though the state's burden of proof is "clear and convincing," this standard of review is highly deferential and the presence of only "some competent, credible evidence" to support the trial court's finding requires us to affirm it. Id. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. This principle applies to suppression hearings as well as to trials. See State v. Fanning
(1982), 1 Ohio St.3d 19, 437 N.E.2d 583.
 {¶ 23} Important factors for the trial court to consider in determining whether a consent was voluntary include: (1) the suspect's custodial status and the length of the initial detention; (2) whether the consent was given in public or at a police station; (3) the presence of threats, promises, or coercive police procedures; (4) the words and conduct of the suspect; (5) the extent and level of the suspect's cooperation with the police; (6) the suspect's awareness of his right to refuse to consent and his status as a "newcomer to the law"; and (7) the suspect's education and intelligence. See Schneckloth,412 U.S. at 248-249; see, also, State v. Lattimore, Franklin App. No. 03AP-467, 2003-Ohio-6829, at ¶ 14; State v. Dettling
(1998), 130 Ohio App.3d 812, 815-816, 721 N.E.2d 449.
 {¶ 24} However, an individual's knowledge of the right to refuse consent "is not a prerequisite of a voluntary consent."Schneckloth, 412 U.S. at 234. Rather, it must be determined if a person felt compelled to submit to the officer's questioning in light of the police officer's superior position of authority.Robinette, 80 Ohio St.3d at 244-245. "The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." Drayton,536 U.S. at 206 (citing Ohio v. Robinette (1996), 519 U.S. 33, 39-40,117 S.Ct. 417, 136 L.Ed.2d 347; Schneckloth, 412 U.S. at 227). While knowledge of the right to refuse consent is one factor, the state need not establish such knowledge as the sine qua non of an effective consent. Drayton, 536 U.S. at 206-207. "Nor do this Court's decisions suggest that even though there are no per se rules, a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning. See, e.g.,Schneckloth, supra; Robinette, supra." Drayton,536 U.S. at 207.
 {¶ 25} Application of the seven factors found inSchneckloth shows that the trial court's finding that Fry voluntarily consented to the search is not against the manifest weight of the evidence. At the time that the trooper requested Fry's consent, he was not under arrest and the trooper had advised him that he was free to leave. Fry gave consent in a public parking lot. No evidence of any threats, promises, or coercive police tactics exists. Fry's inquiry about the reasons why the trooper wanted to search his vehicle indicated he was concerned but do not show that he refused consent. The state's evidence suggests that both Fry and Trooper Mercer were polite and courteous with each other throughout the exchange. The court determined that a person of Fry's background and education level should have understood his right to refuse consent. Moreover, some evidence exists that the trooper advised appellant that he did not have to consent. While appellant claims that he refused to consent, the court obviously found his claims not credible. The court specifically found that Fry consented. Thus, it must have deemed the trooper's testimony that Fry consented more credible than Fry's testimony that he did not. We will not second-guess its credibility decisions. See, e.g., State v.Lee, Summit App. No. 21854, 2004-Ohio-3946; State v. Kimes,
Meigs App. No. 02CA11, 2003-Ohio-3752.
 {¶ 26} Appellant's complaint that he was trained to listen to authority does not render his consent involuntary. "`While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.'"Drayton, 536 U.S. at 205 (quoting I.N.S. v. Delgado (1984),466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247).
 {¶ 27} Nonetheless, Fry argues that Robinette III requires us to reverse the trial court's judgment. There, the court concluded that the defendant, who was subjected to an illegal detention, did not voluntarily consent to a search of his vehicle. The officer had stopped the defendant for speeding. He decided to give the defendant a warning and "without any break in the conversation and still in front of the [patrol vehicle's video] camera," the officer stated to the defendant, "One question before you get gone [sic]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" The court concluded this inquiry was not illegal. SeeRobinette, 80 Ohio St.3d at 241. The defendant denied having any contraband in the car. The officer then immediately asked the defendant if he could search the car. The court concluded that this follow up question and detention were improper. Id. In response to the additional question, the defendant hesitated, looked at his car, looked back at the officer, then nodded his head. During the search the officer recovered some marijuana and a pill and subsequently charged the defendant with drug abuse.
 {¶ 28} At a suppression hearing, the defendant explained the circumstances surrounding the search: "Q And did [the officer] indicate to you that at that time [when he returned from activating the video camera] that he was giving you a warning and that you were free to go? A Yes, he did. Q And then at that time, I think, as the tape will reflect, the officer asked you some questions about did you have any weapons of any kind, drugs, anything like that. Do you recall that question? A Yes. * * * Q Did you in fact feel that you were free to leave at that point? A I thought I was. * * * Q The officer then asked if he could search your vehicle. What went through your mind at that point in time? A Uhm, I was still sort of shocked and I — I thought — I just automatically said yes. Q Did — did you feel that you could refuse the officer? A No."
 {¶ 29} The Ohio Supreme Court stated that the officer's "words did not give [the defendant] any indication that he was free to go, but rather implied just the opposite — that [the defendant] was not free to go until he answered [the officer]'s additional questions." The court found the time between the officer informing the defendant of the warning for speeding and the questions regarding contraband "troubling." It stated: "`The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.'" Robinette,80 Ohio St.3d at 243-244 (quoting Robinette I, 73 Ohio St.3d at 654).
 {¶ 30} The court thus concluded: "When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. * * * From the totality of the circumstances, it appears that [the defendant] merely submitted to `a claim of lawful authority' rather than consenting as a voluntary act of free will. Under Royer, this is not sufficient to prove voluntary compliance. Royer,460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236." Robinette,80 Ohio St.3d at 244-245.
 {¶ 31} Here, the circumstances surrounding Trooper Mercer's request to Fry for consent to search bear some similarity toRobinette. But the circumstances are not so similar that we must reverse the trial court's finding that Fry voluntarily consented to the search. In Robinette, the officer did not tell the defendant that he was free to leave before questioning the defendant. Instead, the officer stated, "One question before you get gone," which implied that the defendant was not free to leave until the officer had finished his question. And in fact, the officer persisted in posing additional questions or requests, which the court determined were improper. In this case, however, there is some evidence that Trooper Mercer told Fry that he was free to leave, that the traffic stop had ended, and then asked for consent to search. Trooper Mercer's request for consent may have closely followed his statement that the stop had ended. But we see nothing so overbearing in Mercer's requests that requires us to conclude the trial court's determination of voluntariness was against the manifest weight of the evidence.
 {¶ 32} Therefore, we overrule appellant's first and second assignments of error.
 II {¶ 33} In his third assignment of error, Fry contends that his possession of marijuana and possession of drug paraphernalia convictions are against the manifest weight of the evidence. He asserts that his mere ownership and operation of a vehicle in which contraband is found does not justify a finding of guilt. He claims that the following facts show that his convictions are against the manifest weight of the evidence: (1) other people had been around his vehicle on the day of the search; (2) he does not have any prior drug related convictions; (3) his wife uses the car; (4) his car was located "in two party atmospheres that day, a graduation and a concert"; (5) one individual who was in the car that day was a stranger; (6) the car was not locked at all times; and (7) he testified that he did not know how the marijuana and drug paraphernalia got in his car.
 {¶ 34} When considering whether a conviction is against the manifest weight of the evidence, our role is to determine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction."State v. Getsy (1998), 84 Ohio St.3d 180, 193, 702 N.E.2d 866. The reviewing court sits, essentially, as a "`thirteenth juror' and [may] disagree with the fact finder's resolution of the conflicting testimony." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Tibbs v. Florida
(1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652. The reviewing court must dutifully examine the entire record, weighing the evidence and considering the credibility of witnesses, but keeping in mind that credibility generally is an issue for the trier of fact to resolve. State v. Thomas (1982),70 Ohio St.2d 79, 80, 434 N.E.2d 1356; State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The reviewing court may reverse the conviction if it appears that the fact finder, in resolving evidentiary conflicts, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. On the other hand, we will not reverse a conviction if the state presented substantial evidence upon which the trier of fact could reasonably conclude that all essential elements of the offense had been established beyond a reasonable doubt. State v. Eley
(1978), 56 Ohio St.2d 169, 383 N.E.2d 132, syllabus.
 {¶ 35} R.C. 2925.11(A) sets forth the essential elements constituting a possession of marijuana offense and provides: "No person shall knowingly obtain, possess, or use a controlled substance."
 {¶ 36} R.C. 2925.14(C)(1) sets forth the essential elements constituting a possession of drug paraphernalia offense and provides: "No person shall knowingly use, or possess with purpose to use, drug paraphernalia."
 {¶ 37} In this case, Fry disputes whether the state presented substantial evidence upon which the trier of fact could reasonably conclude that the possession elements had been established beyond a reasonable doubt.
 {¶ 38} R.C. 2925.01(K) defines "possession": "`Possess' or `possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."
 {¶ 39} Possession may be actual or constructive. State v.Butler (1989), 42 Ohio St.3d 174, 176, 538 N.E.2d 98; see, also,State v. Hilton, Summit App. No. 21624, 2004-Ohio-1418. Actual possession exists when the circumstances indicate that an individual has or had an item within his immediate physical possession. Constructive possession exists when an individual is able to exercise dominion or control of an item, even if the individual does not have the item within his immediate physical possession. State v. Hankerson (1982), 70 Ohio St.2d 87,434 N.E.2d 1362, syllabus; State v. Wolery (1976)46 Ohio St.2d 316, 329, 348 N.E.2d 351; see, also, State v. Dunn, Cuyahoga App. No. 83754, 2004-Ohio-4350; Hilton; State v. Miller,
Cuyahoga App. No. 81608, 2003-Ohio-1168. Dominion and control may be established by circumstantial evidence alone. State v.Taylor (1997), 78 Ohio St.3d 15, 676 N.E.2d 82; State v. Jenks
(1991), 61 Ohio St.3d 259, 272-73, 574 N.E.2d 492.
 {¶ 40} A defendant's mere presence in an area where drugs are located is insufficient to demonstrate that the defendant constructively possessed the drugs. State v. Cola (1991),77 Ohio App.3d 448, 450, 602 N.E.2d 730; see, also, Cincinnati v.McCartney (1971), 30 Ohio App.2d 44, 506 N.E.2d 256 (defendant did not possess marijuana when he was found sitting six feet from a growing marijuana plant in an apartment he did not occupy or own). "However, the defendant's proximity to the object may constitute some evidence of constructive possession." State v.Fairrow (Nov. 27, 1995), Ross App. No. 95 CA 2096 (citing Statev. Pruitt (1984), 18 Ohio App.3d 50, 480 N.E.2d 499; State v.Lavender (Mar. 12, 1993), Cuyahoga App. No. 60493); see, also,State v. Barr (1993), 86 Ohio App.3d 227, 620 N.E.2d 242;State v. Triplett, Cuyahoga App. No. 84064, 2004-Ohio-4230 (holding that sufficient circumstantial evidence of constructive possession exists when drugs are found near a defendant); Statev. Stewart, Cuyahoga App. No. 83428, 2004-Ohio-4073 (concluding that sufficient circumstantial evidence of constructive possession exists when the drug was within the defendant's reach and he was able to exercise dominion and control over the drug);State v. Ballou, Cuyahoga App. No. 83160, 2004-Ohio-2339 (holding that the defendant constructively possessed bag of crack cocaine that was located on the console of the front passenger seat where he was sitting); State v. Davis (Sept. 24, 1998), Franklin App. No. 98AP-192 (stating that "it is reasonable to infer that a defendant knowingly possesses cocaine when he is shown to have had dominion and control over a bag of cocaine which was next to his seat in a car").
 {¶ 41} Moreover, a defendant's "possession of the keys to the automobile is a strong indication of control over the automobile and all things found in or upon the automobile." Thus, when one is the driver of a car in which drugs are within easy access of the driver, constructive possession may be established. SeeState v. Morehouse (Oct. 19, 1989), Cuyahoga App. No. 56031, quoted with approval in State v. Ray, Medina App. No. 03CA62-M, 2004-Ohio-3412; State v. Miller (July 27, 1999), Ross App. No. 98CA2467; and State v. Kurtz (Oct. 27, 1998), Franklin App. No. 98AP-210); see, also, State v. Williams, Ross App. No. 03CA2736, 2004-Ohio-1130 (concluding that constructive possession established when the defendant had easy access to the drug, the drug was located directly on top of a receipt bearing the defendant's name, and the officers smelled burnt marijuana in the vehicle).
 {¶ 42} Here, the evidence supports a finding that Fry constructively possessed the marijuana and the drug paraphernalia. Both were recovered from a compartment in the driver's side door and, thus, were within Fry's immediate reach. Both were located next to Fry's cell phone. Furthermore, Fry possessed the keys to the vehicle. Consequently, his convictions are not based simply upon his mere presence in the proximity of the drugs and they are not against the manifest weight of the evidence.
 {¶ 43} We overrule Fry's third assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Jackson County Municipal Court to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Abele, J.: Concur in Judgment and Opinion.
[2] In Southern, we questioned whether the voluntariness of an individual's consent to search should be a question of fact, but ultimately decided that we must follow the Ohio Supreme Court's pronouncement on the issue. We stated: "We are tempted to question whether voluntariness in reality presents a factual issue requiring deferential review. See, e.g., Arizona v.Fulminate (1991), 499 U.S. 279, 287 (the ultimate issue of voluntariness in a confession context is a legal question) andO'Day v. Webb (1972), 29 Ohio St.2d 215, 219 (simply because a question of law involves consideration of the facts does not turn it into a question of fact). See, also, Ruta v.Breckenbridge-Remy Co. (1982), 69 Ohio St.2d 66, 68. Nonetheless, we are duty bound to follow Ohio v. Robinette,
supra, and State v. Robinette, * * *."